**UNITED STATES of America, Plaintiff,**

v.

**Peter Clay WILMOTH, Defendant.**
**Crim. A. No. 70–350–J.**

United States District Court,
D. Massachusetts.

May 10, 1971.

Herbert F. Travers, Jr., U. S. Atty., George V. Higgins, Asst. U. S. Atty., for Government.

Sebastian J. Ruggeri, Greenfield, Mass., for defendant.

## MEMORANDUM

JULIAN, District Judge.

The defendant, Peter Clay Wilmoth, was indicted on three counts of unlawful possession of firearms in violation of federal statutes. Defendant Wilmoth has moved to suppress evidence seized from him at the time of his arrest and has requested that the seized property be returned to him. An evidentiary hearing was held on this motion on March 3, 1971. On the evidence presented at the hearing, I find that the following incidents occurred on the evening of May 6, 1970, when defendant was arrested, and the early morning hours of May 7, 1970, immediately following defendant's arrest.

In the early evening of May 6, 1970, William Pickett, a special investigator with the enforcement branch of the Alcohol, Tobacco, and Firearms Division of the Treasury Department, who had been investigating the defendant Wilmoth for possible violations of the federal Gun Control Act of 1968, observed defendant's car parked in front of an establishment called "Guns, Incorporated," at 120 Exchange Street, in Chicopee, Massachusetts. Entering the store, Pickett saw the defendant Wilmoth standing at the counter talking to the storeowner. In defendant's possession was a double-barreled, sawed-off shotgun; its barrel appeared to Agent Pickett to be less than 18 inches long. Pickett, acting in an undercover capacity, represented himself to defendant as a person selling M-2 conversion kits for carbine rifles. Pickett asked defendant if the defendant's sawed-off shotgun was for sale. Defendant replied that he would sell it, and that he had some more "sawed-offs" in his car.

Pickett and defendant then left the store and went to Wilmoth's car outside. Defendant took out of his car and handed to Pickett two more firearms, a single-barreled, sawed-off shotgun with a threaded muzzle and a cut-down British Enfield Rifle. Defendant told Pickett that he had threaded the muzzle of the single-barreled shotgun in order to put a silencer on it. It was dark outside by this time, and the two men went back into the store.

Pickett and defendant discussed sales prices for the weapons. They negotiated a price of $15 for the single-barreled shotgun and $35 for the British Enfield Rifle. Defendant was uncertain what price to ask for the double-barreled shotgun. At some time during these negotiations Pickett told defendant that he wanted to call a gun collector friend of his to come and examine the weapons. Pickett telephoned Special Agent Paul Flynn, of the Alcohol, Tobacco, and Firearms Division of the Treasury Department, and asked him to come to Guns, Incorporated. Defendant was not informed of Agent Flynn's identity. Pickett and defendant had further conversation in the store until Agent Flynn

arrived. Flynn was accompanied by Agent Smallwood, also of the Alcohol, Tobacco, and Firearms Division of the Treasury Department.

Defendant Wilmoth agreed to provide ammunition for the weapons, and the four men went out to his car. Defendant got into the car and handed out ammunition for the guns to Agents Pickett and Flynn. When Wilmoth got out of the car, the agents identified themselves and placed defendant under arrest. Agent Flynn read the *Miranda* warnings to defendant from a standard Treasury Department statement-of-rights form, Form 5661. Agents Flynn and Pickett then searched defendant's car and found a fourth weapon under the driver's seat, a .22 caliber bolt action rifle, with its barrel and stock cut off.

One of the agents drove defendant's car to a Treasury Department "contract garage" in Springfield. The car was searched again there, but no other weapons or evidence was found. Defendant Wilmoth himself was taken to the Springfield office of the Alcohol, Tobacco, and Firearms Division. Again Agent Flynn read the *Miranda* warnings to defendant from Treasury Department Form 5661. Defendant signed a waiver-of-rights form, Treasury Form 4176, which also contained a complete statement of defendant's constitutional rights. I find that defendant understandingly waived his constitutional rights.

The agents then proceeded to question defendant. When asked if he had any other illegal weapons, defendant mentioned that he had a British Piat Anti Tank Launcher at his home in Belchertown, but that he did not know if it was an illegal weapon or not. Defendant said he had purchased the weapon two years earlier for ten dollars. Agent Pickett told him that it was a violation weapon, and defendant agreed to produce it for the agents.

After he was questioned at the Springfield office of the Alcohol, Tobacco, and Firearms Division, defendant was then taken to the Springfield police station to be fingerprinted and photographed. Thereafter, defendant was transported to Worcester to appear before United States Commissioner Philip R. Kneeland. This appearance occurred at about 1:00 a. m. on May 7. In the presence of Commissioner Kneeland, defendant consented to a search of his home in Belchertown for the rocket launcher.

After Commissioner Kneeland set bail and released the defendant from custody, Agents Pickett and Flynn drove defendant back to his home in Belchertown. The two agents waited in their car parked in front of the defendant's house, and defendant went into his house and then returned with the rocket launcher, which he turned over to the agents. The agents then drove defendant back to Springfield, where defendant picked up his car.

■ First, it is clear from the record that both Agent Pickett and Agent Flynn were acting in an undercover capacity. Wilmoth relinquished possession of the double-barreled shotgun, the single-barreled shotgun, the British Enfield Rifle, and a quantity of ammunition to the agents voluntarily, not realizing that they were federal agents. The government is entitled to employ artifices or stratagems to capture those engaged in criminal activity, and indeed, without undercover work, crime detection could come to a virtual standstill. There is no constitutional infirmity in reasonable undercover work such as employed by Agents Pickett and Flynn in this case. Lewis v. United States, 1966, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312. Accordingly, there is no reason to suppress the double-barreled shotgun, the single-barreled shotgun, the British Enfield Rifle, or the ammunition.

■■ The fourth rifle, the sawed-off .22 caliber bolt action rifle, was found by Agents Pickett and Flynn under the front seat of Wilmoth's car when they searched his car immediately after he

was arrested. I find that this rifle was seized as a result of a reasonable search incident to a lawful arrest. It is lawful for arresting officers to search an arrestee's person for weapons and to seize evidence to prevent its being concealed or destroyed, and the officers may also search the area from within which the arrestee could gain possession of a weapon or destructible evidence. Chimel v. California, 1968, 395 U.S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685. In this case, defendant Wilmoth was arrested immediately after he had gotten out of his car; he was at the time of his arrest very near the interior of his automobile. He had already procured two weapons and a good deal of ammunition from the car, and it was reasonable for the arresting agents to believe that there might be other weapons in the car to which defendant had ready access and which he might use in resisting arrest or in effecting an escape.

■ In addition, the Supreme Court has drawn a distinction between the circumstances which justify a warrantless search of a home or office, on one hand, and an automobile on the other. An automobile may be searched without a warrant if there is probable cause for the searching authorities to believe that the car contains articles the authorities are entitled to seize. Chambers v. Maroney, 1970, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419; Carroll v. United States, 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L. Ed. 543. Since defendant only minutes before had been handing guns and ammunition out of his car to Agents Pickett and Flynn, the two agents had ample cause to believe the car might contain other unlawful weapons.

Therefore, there is no basis upon which to suppress the .22 caliber bolt action rifle which Agents Flynn and Pickett found under the driver's seat when they searched the defendant's car immediately after defendant's arrest.

■ The fifth weapon involved, the British Piat Anti Tank Rocket Launcher, was not obtained through a search

and seizure at all. On the contrary, defendant, having been released from custody on bail by United States Commissioner Kneeland, voluntarily turned the weapon over to Agents Flynn and Pickett.

Defendant Wilmoth testified that he agreed to turn the rocket launcher over to the agents only because Agent Pickett had told him that if he turned it in, it would not be used against him. Agents Pickett and Flynn specifically denied that Pickett made any such statement to the defendant. I find as a fact that no such statement was made to the defendant. I find that the defendant freely and voluntarily produced the launcher and turned it over to the agents and that he was not induced to do so by any representation or promise made by either agent. See United States v. Burke, 1963, D.Mass., 215 F.Supp. 508, affirmed in Burke v. United States, 1964, 1 Cir., 328 F.2d 399.

Defendant Wilmoth orally gave consent to a search of his house for the launcher when he was interrogated at the Springfield office. After he was again advised of his constitutional rights before Commissioner Kneeland, defendant again, in the presence of Commissioner Kneeland, orally gave his consent to a search of his house for the rocket launcher. Commissioner Kneeland then set bail and released defendant from custody, and the two agents drove defendant to his home in Belchertown. The defendant entered the house alone, while the agents remained outside. Defendant brought the rocket launcher outside and gave it to the agents.

I note that the evidence shows that the defendant was arrested about 9:00 p. m. on May 6, and that he gave the rocket launcher to the Treasury Agents at approximately 4:00 a. m. the following morning. Thus, defendant was in the company of Agents Flynn and Pickett for approximately seven hours. In Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the Supreme Court warned that "lengthy inter-

rogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights." 384 U.S. at 476, 86 S.Ct. at 1629. However, in this case the defendant revealed that he possessed the weapon when he was questioned at the Springfield office of the Alcohol, Tobacco, and Firearms Division, after proper warnings and only a short time after he was arrested. In addition, defendant was taken before Commissioner Kneeland at about 1:00 a. m. on May 7, when he voluntarily consented to a search of his home. In view of these precautions, I find that the lapse of time between the defendant's arrest and his relinquishment of the rocket launcher did not operate as a coercive influence upon the defendant and did not affect the voluntary nature of his act.

The defendant's motion to suppress is denied.